UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| KAYLEIGH BELLISLE,<br>        Plaintiff,<br><br>        v.<br><br>LANDMARK MEDICAL CENTER;<br>PRIME HEALTHCARE SERVICES-<br>LANDMARK, LLC; UNITED<br>NURSES & ALLIED<br>PROFESSIONALS, INC.;<br>CHARLENE ELIE; and GLENN<br>MILLER,<br>        Defendants. | C.A. No. 14-266-M-LDA |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Judge.

Landmark Medical Center terminated Kayleigh Bellisle from her employment as a registered nurse after it investigated several reports of inappropriate behavior by her including: dyeing her hair during a work shift, swearing at and harassing fellow employees and patients, using a cell phone at the nurses' station in contravention of hospital policy, and possessing an illegal weapon[1] – a stun-gun – at work. Her union, United Nurses & Allied Professionals, Inc. ("Union") provided representation during the disciplinary and termination process

---

[1] Rhode Island law states that "No person shall carry or possess or attempt to use against another any instrument or weapon of the kind commonly known as a blackjack, slingshot, billy, sandclub, sandbag, metal knuckles, slap glove, bludgeon, stun-gun, or the so called "Kung-Fu" weapons." R.I. Gen. Laws § 11-47-42. The record references a taser, another name for a stun-gun. The Court will use the terms stun-gun and taser interchangeably.

in accordance with its role set forth in the collective bargaining agreement ("CBA"), and the parties eventually settled Ms. Bellisle's grievances by agreement.

Ms. Bellisle sued Landmark, Landmark's owner Prime Healthcare Services-Landmark, LLC, and two Landmark employees, Charlene Elie and Glenn Miller, charging them with various discrimination and retaliation claims as well as state law tort claims.   She alleges that Defendants subjected her to a hostile work environment and ultimately terminated her because of her sexual orientation and that she was retaliated against after taking an approved medical leave of absence. Ms. Bellisle has also sued Union for failing properly to represent her in breach of the terms of CBA during the several grievance procedures following her disciplinary actions.   All Defendants have moved for summary judgment.   Because the Court finds that it is undisputed that Landmark terminated Ms. Bellisle because of inappropriate conduct, not her sexual orientation, and that Landmark did not retaliated against her or subject her to a hostile work environment, the Landmark Defendants' Motion for Summary Judgment (ECF No. 33) is GRANTED.  The Court GRANTS the Union's Motion for Summary Judgment (ECF No. 36) as well.

## FACTS

On March 5, 2012, Landmark hired Ms. Bellisle to work as a registered nurse in its Progressive Care Unit.   Several months into her employment, Ms. Bellisle discovered that she was pregnant and took a four month medical leave of absence. Upon her return, she requested and received a transfer to the Emergency Department.

2

Sometime in September or October of 2013, Ms. Bellisle claims that it became known at Landmark that she is a lesbian and she believes that her problems at work began with that knowledge. Ms. Bellisle reported to her supervisor, Melissa Frias, that her shift supervisor was treating her poorly. Ms. Frias notified the human resources department about Ms. Bellisle's complaint and as a result, the shift supervisor was informed about standards for behavior at Landmark. Landmark did not conclude any wrongdoing because it could not substantiate Ms. Bellisle's complaint.

During the course of her employment, Ms. Bellisle and her co-worker, Defendant Glenn Miller, engaged in several text message exchanges discussing Ms. Bellisle's relationship with her girlfriend and her interactions with other employees at Landmark. The messages included a string of scissor emoji's that Ms. Bellisle indicates is a lesbian symbol. Ms. Bellisle alleged that Mr. Miller made two offensive comments about her sexual orientation in the text message exchanges. Ms. Bellisle told Mr. Miller that the comments were offensive, but she did not report this to anyone at Landmark.

On January 5, 2014, while she was working the night shift, Ms. Bellisle dyed her hair in the sink of the hospital's break room. Dr. John Jardine, who observed this behavior, reported the incident to Ms. Bellisle's supervisor, Melissa Frias. The next day, Ms. Frias met with Ms. Bellisle to discuss Dr. Jardine's report. Ms. Bellisle admitted to dyeing her hair, but asserted that she was on an unpaid break, even though she also admitted that she did not notify anyone that she was taking a

break.   Landmark considered terminating her, but instead gave Ms. Bellisle a written warning.   Represented by the Union, Ms. Bellisle grieved the discipline because she argued that the break was unpaid.[2]   Landmark's chief nursing officer, Charlene Elie denied the grievance at step two.

A few days after the hair dyeing discipline, Ms. Bellisle e-mailed Ms. Frias that she would be unable to work because her daughter's father had passed away. She then e-mailed the president, human resources director, and chief nursing officer to report her belief that on a number of occasions Dr. Jardine communicated with her less than he did with other employees because of her sexual orientation.   Ms. Elie responded to Ms. Bellisle's e-mail and informed her that Landmark would conduct an investigation.   Approximately a week later, Ms. Bellisle dropped her claims of discrimination against Dr. Jardine while continuing to maintain that he had treated her in an unprofessional manner.   Afterwards, Landmark instructed Dr. Jardine to communicate with Ms. Bellisle in a professional manner.

After returning from a one-week leave, Ms. Bellisle sent an e-mail to Ms. Frias stating that she felt that her co-workers were subjecting her to harassment and discrimination because of her sexual orientation.   She based this on the fact that she overheard staff speaking about her sexual orientation.   Ms. Frias forwarded the e-mail to human resources for further investigation.

On January 15th, several hours after she was disciplined for the hair-dyeing incident, Dr. Jardine and Ms. Frias observed Ms. Bellisle using her cell phone at the

---

[2] Ms. Elie investigated Ms. Bellisle's claim that she was off the clock during the break and determined that she was not.   ECF No. 34 ¶ 59.

4

nurses' station, in violation of Landmark's personal communication device policy. The prohibition on cell phone use had been discussed at a staff meeting five days earlier. Ms. Bellisle singed that she received a copy of the cell phone prohibition policy. Landmark issued Ms. Bellisle a second written warning for violating this policy. Although she declined union representation, the Union filed a second grievance at step two in response to Landmark's disciplinary action.

In February 2014, Ms. Frias received a few reports that Ms. Bellisle was verbally abusive to co-workers and patients. First, Mr. Frias received a report that after getting into an argument with a doctor, Ms. Bellisle berated him to other staff members. Second, a co-worker informed Ms. Frias that Ms. Bellisle was arguing loudly with a psychiatric patient and when confronted, Ms. Bellisle stormed out of the room. Third, Landmark's risk manager informed Ms. Frias that a patient's family called to complain that she heard Ms. Bellisle telling a patient, "Shut up, shut up! You did this to yourself. You are a cocaine addict." Lastly, a fellow nurse observed Ms. Bellisle swearing at a doctor in front of a patient. Landmark supervisory personnel were preparing a third warning to Ms. Bellisle about her behavior when Landmark terminated her employment for the incident that ultimately became the straw that broke the camel's back.

That same month, a Landmark employee reported that she observed Ms. Bellisle with a taser while at work at the hospital. Ms. Bellisle denied bringing the weapon to the hospital, yet she had posted to her Facebook page, "I think it should be legal for nurses on duty to carry tasers . . . many animals out there these days."

5

Landmark conducted an investigation, in which three employees reported that they observed Ms. Bellisle possessing a taser at the nurses' station.   Landmark concluded that Ms. Bellisle had brought an illegal weapon to work.  It terminated her employment.  Ms. Bellisle's union representative filed a grievance at step three in response to the termination.

The grievance process proceeded for several weeks.  Ms. Bellisle became impatient at the pace of the process.  Ultimately, in April 2014, Ms. Bellisle, the Union, and Landmark signed and executed a Memorandum of Agreement whereby Ms. Bellisle voluntarily resigned from Landmark and Landmark agreed not to object to her application for unemployment benefits.  Ms. Bellisle and the Union agreed to withdraw any pending grievances from arbitration with prejudice.

Ms. Bellisle filed this twelve count complaint alleging violations of the: (1) Title VII of the Civil Rights Act of 1964 ("Title VII") for hostile work environment against Landmark and Prime; (2) Title VII for retaliation against all the Defendants; (3) Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq. ("FMLA") against all the Defendants; (4) Hybrid-Labor Management Relations Act, 29 U.S.C. § 185 ("HLMRA") against Landmark; (5) duty of fair representation under HLMRA against the Union; (6) Rhode Island Fair Employment Practices Act, R.I. Gen. Laws § 28-5-1, et seq. ("RIFEPA") against all the Defendants; (7) Rhode Island Civil Rights Act, R.I. Gen. Laws § 42-112-1, et. seq. ("RICRA") against all the Defendants; (8) Rhode Island Parental and Family Medical Leave Act, R.I. Gen. Laws § 28-48-1, et seq. ("RIPFMLA") against all the Defendants; (9) intentional

infliction of emotional distress against Charlene Elie and Glenn Miller; (10) tortious interference with contractual relations against Ms. Elie and Mr. Miller; (11) defamation against Ms. Elie and Mr. Miller; and (12) defamation against Landmark and Prime. All Defendants have moved for summary judgment on all counts. ECF Nos. 33, 36.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure governs the process of summary judgment. Summary judgment is appropriate when (1) the moving party demonstrates the absence of any genuine issue of material fact and (2) the non-moving party fails to demonstrate that a trier of fact could reasonably resolve that issue in the non-movant's favor. *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 4 (1st Cir. 2010). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Even in cases where motive and intent are at issue, the court may grant summary judgment if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation. *See Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990); *Rossy v. Roche Products, Inc.*, 880 F.2d 621, 624 (1st Cir. 1989).

The Court views the evidence submitted in the light most favorable to the non-moving party and draws all reasonable inferences in her favor.   *Wilson v. Moulison N. Corp.*, 639 F.3d 1, 6 (1st Cir. 2011).

## ANALYSIS

A.   *Hostile Work Environment Claim under Title VII, RIFEPA, and RICRA -- Counts I, VI, and VII*

Ms. Bellisle alleges that Defendants Landmark and Prime created a hostile work environment by allowing several employees to harass, stereotype, and mistreat her based on her sexual orientation.   Ms. Bellisle alleges that this discriminatory behavior resulted in unfounded discipline and termination.   Not unexpectedly, Landmark and Prime object and move for summary judgment because they argue that Ms. Bellisle was not subjected to an abusive work environment, but was disciplined for inappropriate behavior and ultimately terminated for possessing an illegal weapon at the hospital.

Title VII of the Civil Rights Act contained in Count I is easily dispatched. "Title VII does not proscribe harassment simply because of sexual orientation." *See Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 259 (1st Cir. 1999); *Ferro v. R.I. Dept. of Transp. ex rel. Lewis*, 2 F. Supp. 3d 150, 156 (D. R.I. 2014). Therefore, Title VII cannot provide Ms. Bellisle with any relief on her hostile work environment claim.[3]   Ms. Bellisle brings parallel state law claims, however, under

---

[3] In addition, Count II, for retaliation brought under Title VII, fails for the same reason. *See Ayala-Sepulveda v. Municipality of San German*, 661 F. Supp. 2d 130, 138 (D.P.R. 2009) ("[t]hough the plaintiff might have had a subjective belief that the conduct engaged in by his coworkers and supervisors constituted a Title

RIFEPA and the RICRA. [4]   RIFEPA prohibits discrimination against an employee due to her "race or color, religion, sex, sexual orientation, gender identity or expression, disability, age, or country of ancestral origin." R.I. Gen. Laws § 28–5–7(1).   In addition, RICRA prohibits discrimination because of "race, color, religion, sex, disability, age, or country of ancestral origin." R.I. Gen. Laws § 42–112–1.

Under these state law claims, in order to meet her burden to prove that she endured a hostile work environment based on prohibited discrimination, Ms. Bellisle must establish the following prima facie elements: (1) that she is a member of a protected class; (2) that she was subject to unwelcome harassment; (3) that the harassment was based on her membership in a protected class; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of the plaintiff's employment and create an abusive work environment; (5) the harassment was both objectively and subjectively offensive; and (6) there exists some basis for employer liability.   *Flood v. Bank of Am. Corp.*, 780 F.3d 1, 10 (1st Cir. 2015); *O'Rourke v. City of Providence*, 235 F.3d 713, 728 (1st Cir. 2001).

Ms. Bellisle has met the first three elements of the prima facie case.   There is no dispute that, as a lesbian, she is a member of a protected class and the several claims of mistreatment and harassment, when taken in her favor, arguably meet

---

VII violation, that belief cannot be considered objectively reasonable since his complaint was founded entirely on sexual orientation, which is not a protected activity under Title VII."); *Ianetta v. Putnam Invs., Inc.*, 183 F. Supp. 2d 415, 423 (D. Mass. 2002).

[4] The Court will analyze the parallel federal and state claims together. *Rathbun v. Autozone, Inc.*, 253 F. Supp. 2d 226, 234, 236 (D.R.I. 2003), *aff'd*, 361 F.3d 62, 71 (1st Cir. 2004) (analyzing RIFEPA claims under Title VII and finding that RIFEPA and RICRA claims rise and fall together).

the second and third elements.   Where Ms. Bellisle's claim falters is upon examination of the record evidence on the fourth element – whether the harassment was sufficiently severe or pervasive.

The First Circuit has imparted a clear legal standard that a plaintiff must meet regarding the "severe and pervasive and abusive work environment" element. It mandates that, to be considered hostile, the environment must be "'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment.'" *Kosereis v. Rhode Island*, 331 F.3d 207, 216 (1st Cir. 2003) (internal citations omitted) ("name calling . . . and [] teasing . . . do not rise to the level of 'severe or pervasive conduct,' that is required for a hostile work environment claim.  A hostile work environment generally is not created by a 'mere offensive utterance,' nor does it arise from 'simple teasing, offhand comments, and isolated incidents.'"); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  This Court is very conscious of the fact, however, that an analysis of a hostile work environment claim is "fact specific" and that the "determination is often reserved for a fact finder." *Vega-Colon v. Wyeth Pharms.*, 625 F.3d 22, 32 (1st Cir. 2010) (quoting *Pomales v. Celulares Telefonica, Inc.*, 447 F.3d 79, 83 (1st Cir. 2006)).

Ms. Bellisle relies on her asserted humiliation associated with her co-workers being uncomfortable with and otherwise commenting about her sexual orientation, the lewd text message exchanges with Mr. Miller, and receiving the silent treatment from Dr. Jardine as evidence of severe and pervasive conduct

establishing a hostile work environment. Under any interpretation of the case law none of these instances, individually or collectively, are enough to meet her burden.

First, the evidence shows that, while one of Ms. Bellisle's co-workers admitted to Ms. Frias that she was uncomfortable with Ms. Bellisle, it was not because of her sexual orientation, but rather due to the level of detail about which Ms. Bellisle discussed her sexual relationships at the nurses' station. ECF No. 51 at 8. Second, Ms. Bellisle did not report the two comments Mr. Miller made via text message referencing Ms. Bellisle's sexual orientation to anyone at Landmark and it is undisputed that, after he made these comments, she texted Mr. Miller to say that she did not have a problem with him and loved working with him. ECF No. 34 at ¶¶133-36. Third, it is undisputed that Dr. Jardine did not communicate directly to Ms. Bellisle since May of 2013, long before he learned of her sexual orientation, *id.* at ¶¶ 38-39, 81, breaking any causal connection between his cold treatment and her sexual orientation. By admitting that the only thing that Dr. Jardine did after she disclosed her sexual orientation was to have "someone else tell her patient orders," Ms. Bellisle cannot demonstrate that any of this conduct was "objectively offensive" that "interfered with [her] work performance to an extent that is unreasonable or that altered the conditions of [her] employment." *Vega-Colon*, 625 F.3d at 32. "Offhand comments and a tense or uncomfortable working relationship with one's supervisor are, without more, insufficient to support a hostile work environment claim." *Flood*, 780 F.3d at 12.

Analyzing all of the undisputed material facts, the Court finds that the Landmark employees' actions, when viewed individually or collectively and in the context of a busy hospital emergency room, are not sufficient to establish that Ms. Bellisle was subjected to an environment of severe and pervasive hostility based on her sexual orientation. There is no evidence to establish that Ms. Bellisle's work place was permeated with discriminatory "intimidation, ridicule and insult" to meet the requirement of a hostile work environment claim. *Kosereis*, 331 F.3d at 216.[5] Therefore, the motion for summary judgment is granted on Counts I, VI, and VII.

B.   *FMLA and RIPFMLA Claims -- Counts III and VIII*

Ms. Bellisle next alleges that the Defendants retaliated against her for taking a medical leave by imposing unjustified discipline on her immediately upon her return from leave and then terminating her shortly thereafter without any legitimate grounds to do so. She makes these claims under FMLA and RIPFMLA.

The FMLA and RIPFMLA prohibit an employer from retaliating against an employee for taking a medical leave. 29 C.F.R. § 825.220(c); R.I. Gen. Laws § 28-48-

---

[5] Ms. Bellisle also seems to allege and argue for a liability determination against her employers, Landmark and Prime for its employees' conduct. Despite his label as a "charge nurse," this Court finds that Mr. Miller was not a "supervisor" for purposes of vicarious liability. *See Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2454 (2013). It is undisputed that Mr. Miller did not possess the authority to discipline or fire Ms. Bellisle at the time he reported Ms. Bellisle for dyeing her hair and possessing a stun-gun in the workplace. Furthermore, in order to establish employer liability for a non-supervisory co-employee, the First Circuit held that a plaintiff must demonstrate that the employer knew or should have known of the alleged harassment and then failed to implement prompt and appropriate action. See *Forrest v. Brinker Int'l. Payroll Co., LP*, 511 F.3d 225, 230 (1st Cir. 2007). Ms. Bellisle has not established employer liability because she did not report the sexual text messages by a co-worker, Mr. Miller. Nor has she demonstrated that Landmark knew or should have known about Mr. Miller's comments. *See Id.*

5.   An employee can make a prima facie showing of illegal retaliation if she demonstrates that (1) she availed herself of a protected right under the FMLA; (2) an employment decision adversely affected her; and (3) there is a causal connection between the employees' protected activity and the employer's adverse employer action.[6] *Cham v. Station Operators, Inc.*, 832 F. Supp. 2d 131, 135 (D. R.I. 2011); *see also Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 161 (1st Cir. 1998).   Once the prima facie case is proven, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's [termination]," sufficient to raise a genuine issue of fact as to whether it discriminated against the employee. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *see also Tex. Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981).   The employer "must clearly set forth, through the introduction of admissible evidence, the reasons for the [employee's termination].   The explanation provided must be legally sufficient to justify a judgment for the [employer]." *Burdine*, 450 U.S. at 255.   "If the employer's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case, and the plaintiff retains the ultimate burden of showing that the employer's stated reason for terminating [her] was in fact a pretext for retaliating against [her] for having taken protected FMLA leave." *Hodgens*, 144 F.3d at 161.

While both parties recount many other instances where Ms. Bellisle had verbal altercations with other Landmark employees and patients, in the Court's

---

[6] The elements of the RIPFMLA are "essentially the same elements as the corresponding federal laws" and the "disposition of the federal claims likewise disposes of the parallel state law claims." *Hodgens v. Gen. Dynamics Corp.,* 144 F.3d 151, 158 n. 1 (1st Cir. 1998).

view, there are three incidents at the root of Ms. Bellisle's claims for retaliation claims relating to her medical leave. These three incidents relate to her dyeing her hair at work, using her cell phone at work, and possessing a stun-gun at work.

Ms. Bellisle is unable to establish a causal connection between any of Landmark's disciplinary action that resulted from these incidents and her return from a one-week medical leave. She took a medical leave from January 5, 2014 until January 15, 2014. ECF No. 34 ¶¶ 42-43. She was told she would be disciplined for dyeing her hair on January 6, 2014, before she raised the need or even knew of the need for a medical leave so there can be no causal connection with the hair dyeing incident. ECF No. 34 ¶¶ 21-23. Ms. Bellisle used her cell phone at the nurses' station on January 15, 2014 when she returned from leave. ECF No. 34 ¶¶ 77-78. Landmark put out a memorandum a few days before she returned that she read upon her return indicating that cell phones were not to be used during work hours at the nurses' stations. Ms. Bellisle, however, was observed using her phone in violation of Landmark policy. ECF No. 34 ¶ 75. Her discipline for the cell phone use was based on observed conduct, she does not dispute that she used her cell phone at the nurses' station that day, and Ms. Bellisle has produced no evidence that ties her medical leave to the discipline for using her cell phone.

Furthermore, temporal proximity is not enough to establish a causal connection, especially if the larger picture undercuts any claim of causation. *See Carrero-Ojeda v. Autoridad de Energia Electrica*, 755 F.3d 711, 720 (1st Cir. 2014). The larger picture does, in this case, because Ms. Bellisle was ultimately terminated

for possessing a stun-gun, in violation of Rhode Island state law and hospital policy. Her termination occurred after several employees reported that she had a stun-gun.[7] ECF No. 34 ¶ 97. The employees told Ms. Elie on February 19, 2014, she promptly investigated the reports, and terminated her the next day. Therefore, after assessing the larger picture surrounding Ms. Bellisle's FMLA/RIPFMLA retaliatory claims, this Court finds that Ms. Bellisle has failed to establish a causal connection between her medical leave and Landmark's disciplinary actions that a trier of fact could reasonable resolve in Ms. Bellisle's favor. *See Borges*, 605 F.3d at 5. Therefore, Ms. Bellisle fails to establish a prima facie case for retaliation under the FMLA and RIPFMLA. The Court grants summary judgment to the Defendants on Counts III and VIII.

C.   *Breach of Contract and Tortious Interference with Contractual Relations Claims -- Counts IV and X*

Ms. Bellisle alleges that Landmark breached the terms of the CBA when it disciplined and terminated her. Ms. Bellisle also alleges that Ms. Elie and Mr. Miller tortiously interfered with her rights under the CBA, causing Landmark to unjustly discipline and terminate her. Defendants move for summary judgment, claiming that Section 301 of the Labor Relations Management Act ("LMRA") preempts certain state law claims arising from the CBA.

Section 301 of the LMRA allows, "[S]uits for violation of contracts between an employer and a labor organization representing employees . . ." 29 U.S.C. § 185(a).

---

[7] While Ms. Bellisle denies bringing a stun-gun to work, all objective evidence supports Landmark's reasonable conclusion that she did.

"In creating § 301 of the LMRA, Congress intended 'that a comprehensive, unified, body of federal law should govern actions concerning the interpretation and enforcement of collective bargaining agreements.'" *Fant v. New England Power Serv. Co.*, 239 F.3d 8, 14 (1st Cir. 2001) (quoting *The Developing Labor Law*, at 1698-99 (Patrick Hardin et al. eds., 3d ed. 1992) (1971)). As such, Section 301 preempts a state law claim when "the asserted state law claim plausibly can be said to depend upon the meaning of one or more provisions within the collective bargaining agreement." *Haggins v. Verizon New England, Inc.*, 648 F.3d 50, 54-55 (1st Cir. 2011); *Flibotte v. Pa. Truck Lines, Inc.*, 131 F.3d 21, 26 (1st Cir. 1997). A state law claim can "depend on the meaning" of a collective bargaining agreement if either (1) "it alleges conduct that arguably constitutes a breach of duty that arises pursuant to a collective bargaining agreement," or (2) "its resolution arguably hinges upon an interpretation of the collective bargaining agreement." *Haggins*, 648 F.3d at 55; *Flibotte* 131 F.3d at 26. However, if a "state law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes." *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 410 (1988). In order to determine whether Section 301 preempts Ms. Bellisle's tortious interference with contractual relations claim, the Court must determine if the claim raises purely factual questions that do not require a court to interpret any term of the CBA. *See Haw. Airlines, Inc. v. Norris*, 512 U.S. 246, 261 (1994); *Flibotte*, 131 F.3d at 26.

Section 301 preempts Ms. Bellisle's breach of contract claim because she alleges that Landmark's failure to abide by the terms of the CBA resulted in "substantial interference with the CBA." ECF No. 1 at 48. It is obvious from the allegations in her complaint that Ms. Bellisle's claim that Landmark breached its contractual obligations under the CBA is dependent on an interpretation of the CBA's terms to decide whether Defendants' actions resulted in a "substantial interference with the CBA." *See Fant*, 239 F.3d at 16, concluding that plaintiff "virtually invited" preemption conclusion in his complaint, where he alleged that the treatment constituting the substance of his grievance was in violation of the CBA). The summary judgment record does nothing to change this conclusion. Thus, Ms. Bellisle's breach of contract claim against Landmark is preempted under § 301 and summary judgment is granted.

Ms. Bellisle's tort claim against Ms. Elie and Mr. Miller suffers the same fate. She alleged in her complaint that they "intentionally and improperly interfered with the CBA" by unjustly disciplining and terminating her in "contravention" of the terms of the CBA. ECF No. 1 at 30. In order to determine whether Ms. Elie and/or Mr. Miller violated the CBA in the course of disciplining and terminating Ms. Bellisle, a fact finder would necessarily have to turn to the language of the CBA and interpret its terms. *See O'Donnell v. Boggs*, 611 F.3d 50, 55 (1st Cir. 2010) (the decision to terminate was clearly preempted because no court or jury could decide whether the termination was improper without interpreting the terms of the CBA). Therefore, Section 301 preempts Ms. Bellisle's tortious interference with

contractual relations claim against Ms. Elie and Mr. Miller because the resolution depends on an interpretation of the CBA.[8]

D.   *Intentional Infliction of Emotional Distress -- Count IX*

Ms. Bellisle alleges a claim of intentional infliction of emotional distress against Ms. Elie and Mr. Miller. She argues that she suffered emotional distress when Ms. Elie fired her for possessing a stun-gun and when Mr. Miller made lewd comments to her. Ms. Bellisle's state law claim of intentional infliction of emotional distress in Count IX is independent of the CBA, unlike Counts IV and X, so needs further analysis. It suffers the same fate of dismissal, however, in light of preclusive state law.

"[T]he Rhode Island Workers' Compensation Act provides the sole avenue of redress for employees who have suffered intentional infliction of emotional distress as a result of workplace sexual harassment and other discrimination." *Iacampo v. Hasbro, Inc.*, 929 F. Supp. 562, 581 (D. R.I. 1996). Employees are expressly immunized from liability under the exclusivity provision of the Act. *Id.* at 583 (citing R.I. Gen. Laws § 28-29-20). The only way Ms. Bellisle can escape this fate is to "show either that she is not subject to the WCA, or that the emotional distress

---

[8] This Court may adjudicate a Section 301 pre-empted claim if a plaintiff can demonstrate that "the grievance procedures specified in the CBA have been exhausted." *Haggins*, 736 F. Supp. 2d at 331; *see also Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652 (1965). Alas, she cannot. The undisputed facts show that Ms. Bellisle voluntarily chose not to exhaust the CBA's grievance procedures. ECF No. 41 at 56. Ms. Bellisle, the Union, and Landmark entered into a settlement agreement whereby Ms. Bellisle would resign her position, Landmark agreed not to contest her unemployment benefits application, to remove any discipline from her personnel file, and to provide a neutral employment reference. ECF No. 34 at 127-28. Therefore, the Court cannot adjudicate these claims and dismisses them.

she suffered was unrelated to the workplace." *Id.* at 582.  Neither is shown here. "Unless otherwise proven, an employee is presumed to be under the aegis of the WCA." *Id.*  In addition, there is no dispute that all of the emotional distress she allegedly suffered was related to her employment at Landmark.  Therefore, her intentional infliction of emotional distress claim against Ms. Elie and Mr. Miller must fail and the Court dismisses it as a matter of law.

E.    *Defamation -- Counts XI and XII*

Ms. Bellisle alleges two separate defamation claims.  First, she alleges that Mr. Miller made statements to her supervisor and that Ms. Elie told human resources and the Union that she brought a stun-gun to work, resulting in her termination.  Second, she alleges that Landmark and Prime made defamatory statements to the Rhode Island Department of Labor and Training ("RIDLT") in connection with her post-termination unemployment application.  Ms. Bellisle argues that all of the statements were false and malicious, not privileged, imputed conduct that injuriously affected her reputation, and caused injury to her profession.

A defamatory statement consists of "[a]ny words, if false and malicious, imputing conduct which injuriously affects a [person's] reputation, or which tends to degrade him [or her] in society or bring him [or her] into public hatred and contempt . . ." *Swerdlick v. Koch*, 721 A.2d 849, 860 (R.I. 1998) (quoting *Elias v. Youngken,* 493 A.2d 158, 161 (R.I. 1985)).  In order for Ms. Bellisle to establish a defamation claim, she must prove: (1) a false and defamatory statement concerning

another; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; (4) damages, unless the statement is actionable irrespective of special harm. *Leddy v. Narragansett Television, L.P.*, 843 A.2d 481, 488 (R.I. 2004); *see also Swerdlick*, 721 A.2d at 859-60 (quoting *Healey v. New England Newspapers, Inc.*, 555 A.2d 321, 324 (R.I. 1989)). "It is well-settled that the court shall decide whether a statement contains a defamatory meaning." *Swerdlick*, 721 A.2d at 859.

Presuming for purposes of these motions that the statements about Ms. Bellisle's stun-gun possession are defamatory because they are false, as she alleges, the Court will consider Defendants' argument that Rhode Island's common interest qualified privilege protects them, which protects a party from a defamation claim. This privilege

> "permits a person to escape liability for a false and defamatory statement made about another if the occasion for the publication is such that the publisher acting in good faith correctly or reasonably believes that he has a legal, moral or social duty to speak out, or that to speak out is necessary to protect either his own interests, or those of third persons, or certain interests of the public."

*Ventetuolo v. Burke*, 596 F.2d 476, 485 (1st Cir. 1979) (quoting *Ponticelli v. Mine Safety Appliance Co.*, 247 A.2d 303, 305 (R.I. 1968)).

The Court finds that the statements made among Landmark personnel about Ms. Bellisle's possession of an illegal weapon at work are entitled to qualified privileged. Ms. Elie, Mr. Miller, and the Landmark personnel made the alleged defamatory statements during the reporting and investigation of Ms. Bellisle's possession of an illegal weapon on Landmark's property, a serious violation for

20

policy, if proven.  In making their reports, Landmark and its employees acted on their duty to ensure the safety of the hospital grounds for the public and patients.

Furthermore, Ms. Bellisle's second claim regarding the RIDLT report fails. Landmark's report to the RIDLT was made upon RIDLT's request to provide further information about Ms. Bellisle's termination in order to process her application for unemployment benefits.  It is clear that the interaction between the RIDLT and Landmark's human resources specialist was part of a reciprocal sharing of common information to process Ms. Bellisle's application.  In sum, a qualified privilege exists for statements that Landmark personnel made to RIDLT about the reasons for Ms. Bellisle's termination, upon which RIDLT would make its benefits determination.

In order to overcome a motion for summary judgment based on qualified privilege, Ms. Bellisle must prove that the "primary motivating force for the communication was the publisher's ill will or spite." *Mills v. C.H.I.L.D., Inc.*, 837 A.2d 714,720 (R.I. 2003); *Ponticelli*, 247 A.2d at 308.  Ms. Bellisle does not present any evidence that demonstrates that ill will or spite was the primary motivation for anyone who made the statements.  The Court finds no evidence of ill will and, as such, grants summary judgment as to Ms. Bellisle's defamation claims, Counts XI and XII.

F.   *Breach of the Duty of Fair Representation Claim -- Count V*

The Court turns to Ms. Bellisle's allegations leveled at the Union.  Ms. Bellisle alleges that the Union breached its duty of fair representation under the

Hybrid-Labor Management Relations Act, 29 U.S.C. § 185, by failing to pursue her grievances in a timely fashion after Landmark terminated her. Specifically, she alleges that the Union did not take any tangible action on her behalf despite her repeated requests that it do so and that the Union failed to keep her abreast of the status of her grievances. The Union argues that Ms. Bellisle's voluntary withdrawal from the grievance process is fatal to her claim against it for breaching its duty of fair representation. Because the Court finds that the Union cannot breach a duty that Ms. Bellisle voluntarily withdrew from its purview, her claim against the Union fails.

Both parties to a contract are bound by its terms and "[t]hus, if the contract provides for a grievance and arbitration procedure . . . a court ordinarily may not hear the § 301 suit of an employee who has not resorted to the remedies of [her] contract." *Hayes v. New England Millwork Distribs., Inc.*, 602 F.2d 15, 18 (1st Cir. 1979). A party's failure to exhaust contractual remedies prevents a future breach of contract claim. *Republic Steel*, 379 U.S. at 652.

The First Circuit, however, has recognized three exceptions to the exhaustion requirement

> "because circumstances have impugned the integrity of the arbitration process: where (1) 'the union has the sole power to invoke the grievance procedures and the union wrongfully refuses to process or perfunctorily handles the grievance;' (2) 'the employer repudiates the grievance procedures;' or (3) 'resort to the grievance procedures would be futile.'"

*Ramirez-Lebron v. Int'l Shipping Agency, Inc.*, 593 F.3d 124, 132 (1st Cir. 2010) (quoting *Cabarga Cruz v. Fundacion Educativa Ana G. Mendez, Inc.*, 822 F.2d 188, 192 (1st Cir. 1987)).

The Union filed three grievances on Ms. Bellisle's behalf in response to Landmark's disciplinary actions and her termination. ECF No. 37 ¶ 50. Outside of one meeting in which Ms. Bellisle declined union representation, the Union attended all of the meetings that pertained to the grievances. ECF No. 37 ¶¶ 54, 70, 71, 79. Ms. Bellisle acknowledged that she was in communication with the Union during this period. Ms. Bellisle contacted the person who was handling her grievances with the Union, to express her frustration at a lack of progress and her desire to "get the Union out of the way so [she] could pursue legal rights on [her] own." ECF No. 41 at ¶ 56. Ms. Bellisle and the Union executed a settlement agreement where they agreed that her termination would be characterized as a resignation and the hospital agreed to not contest her application for unemployment benefits. ECF No. 37 ¶ 88. By virtue of Ms. Bellisle's obvious desire to cut the Union out of her dispute with the hospital and her execution of that agreement, she consented to the withdrawal of her grievances. There is no dispute that Ms. Bellisle failed to exhaust the grievance process, through her voluntary withdrawal of her grievance as part of a settlement with Landmark. ECF No. 37 ¶ 94.

Moreover, none of the three articulated exceptions applies. The Union represented Ms. Bellisle at her disciplinary meetings and filed grievances promptly after each discipline. Additionally, the Union president and attorney were in

communication with Ms. Bellisle during the six-week period after her termination. Through the entire process, the Union expressed a willingness to pursue Ms. Bellisle's grievances.   There is no evidence that the Union acted arbitrarily or intentionally or ignored Ms. Bellisle's rights under the contract.   Essentially, Ms. Bellisle argues that the Union was negligent because it took longer than she would have liked in processing her grievances.  Even if the undisputed facts supported this assertion, mere negligence, is insufficient in establishing a breach of the duty of fair representation, even if the Court were to overlook Ms. Bellisle's failure to exhaust. *See MacKnight v. Leonard Morse Hosp.*, 828 F.2d 48, 51 (1st Cir. 1987).   Thus, Count V against the Union fails and the Court grants the Union's motion for summary judgment. (ECF No. 36).

## CONCLUSION

Because there are no genuine issues of material fact to be decided by a fact-finder, and the Defendants are entitled to judgment as a matter of law, the Court GRANTS the Defendants' Motions for Summary Judgment (ECF Nos. 33, 36).

IT IS SO ORDERED.

John J. McConnell, Jr.
United States District Judge

September 15, 2016